AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Indiana

**SEALED**

| | |
|---|---|
| United States of America<br>v.<br><br>Alexander Clark<br><br>*Defendant(s)* | )<br>)<br>)   Case No.<br>)<br>)          1:22-mj-0731<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  5/27/2022; 6/28/2022, & 8/18/2022  in the county of  Johnson  in the
Southern  District of  Indiana , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Manufacturing and Dealing in Firearms Without a License |
| 18 U.S.C. § 922(o) | Possession and/or Transfer of a Machinegun |
| 26 U.S.C. § 5861(f) | Unlawful Making of a Firearm [as defined in 26 U.S.C. § 5845(a)] |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

/s/ Caleb Anderson
*Complainant's signature*

Caleb Anderson, Special Agent ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by
  telephone   *(reliable electronic means)*

Date:  Date: 8/22/2022

City and state:  Indianapolis, Indiana

Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR CRIMINAL COMPLAINT

1. Your Affiant, Caleb Anderson is a Special Agent (SA) with the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), a component of the United States Department of Justice, and has served in that capacity since August 2020. Your Affiant is currently assigned to the Indianapolis Group III Field Office and is charged with investigating violations of federal firearms, explosives, and arson laws, as well as offenses enumerated in Titles 18 and 26 of the United States Code, for all of which your Affiant has received formal training at the Federal Law Enforcement Training Center and the ATF National Academy. As a federal agent, your Affiant is a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws.

2. Prior to employment with the ATF, I was employed as an Indiana State Trooper with the Indiana State Police (ISP) from 2007 to 2020. From 2016-2020, I was a Detective in the Organized Crime & Corruption Unit and assigned to the ATF full time as a Task Force Officer (TFO) in the ATF Fort Wayne, Indiana Field Office. While I was a TFO, I investigated the same offenses as I currently investigate in addition to state crimes involving firearms and narcotics. As a law enforcement officer, I have been involved in many investigations involving homicides, armed drug trafficking, felons in possession of firearms, National Firearm Act (NFA) violations, Privately Made Firearms (PMF) also known as "ghost gun" firearm investigations, controlled buys of illegal firearms, controlled buys of narcotics, undercover purchases of firearms, FFL burglary's, firearms trafficking, and criminal gang cases, among others. Through my participation in these investigations, I have debriefed numerous defendants, confidential informants, cooperating sources, and witnesses with personal knowledge regarding firearms or

narcotics trafficking. I have also participated in undercover operations, conducted physical and electronic surveillance, managed informants/cooperating sources, seized evidence and contraband, executed search warrants, and arrested defendants. I have also testified several times in judicial proceedings and prosecutions for violations of State and Federal law.

3. The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of presenting probable cause, I have not included each and every fact known to me concerning this investigation.

4. Based on the following, there is probable cause to believe that ALEXANDER CLARK, date of birth xx/xx/1995, has committed the following offenses involving firearms in violations of Title 18, United States Code, Section 922(a)(1)(A) - Manufacturing and Dealing Firearms Without a License; Title 18, United States Code, Section 922 (o) – Possession of a Machinegun; Title 26, United States Code, Section 5861(f) – Making a firearm(s) (machineguns) in violation of the NFA (TARGET OFFENSES).

## APPLICABLE DEFINITIONS

### Glock Conversion Devices

5. Based upon my training and experience, I am aware of conversion devices that have been designed and created for the sole purpose of converting semiautomatic Glock pistols into fully automatic machineguns. These devices vary by design and appearance but all, when properly installed on a semi-automatic Glock pistol, will allow the firearm to expel more than one projectile by a single pull of the trigger at approximately 1,200 rounds per minute. Installation of these conversion devices is fast and simple, requires no technical expertise, and is

completed by removing the polymer slide cover plate on a Glock semi-automatic pistol and replacing it with a conversion device. I also know that these devices are referred to by different names, including but not limited to switches, auto sears, convertors, conversion switches, selector switches, conversion devices, fun switches, and Fire Selector Systems for Glock ("FSSGs"). I know that ATF considers Glock conversion devices as post-May 19, 1986, machineguns. Therefore, apart from official military and law enforcement use, Glock conversion devices may only be lawfully possessed by properly licensed FFLs who have paid the appropriate Special Occupational Tax ("SOT") required of individuals manufacturing, importing, or dealing in NFA weapons, including machineguns.

### Auto Sears & Selector Switches

6. The ATF has examined a part, commonly known as an "auto sear" and identified by various trade names, including "AR 15 auto sear," "drop in auto sear," and "auto sear II" (the "Auto Sear"). The ATF has found that the addition of the Auto Sear to certain AR15 type semiautomatic rifles, manufactured with M16 internal components already installed, will convert such rifles to machineguns by enabling the firearm to shoot automatically more than one shot, without manual loading, by a single function of the trigger. Thus, the Auto Sear is "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun" and, consequently, constitutes a machinegun as defined by 26 U.S.C. § 5845(b). *See* 27 CFR 179.11.

7. A "selector switch" is an item used to switch between semiautomatic and automatic fire. The selector switch itself is only a firearm part and not considered a machinegun.

## Use Of "80% Receivers" To Manufacture Firearms

8. In firearms terminology, the "receiver" is the part of a firearm that houses the operating parts. There are many types and styles of firearm receivers. The term "80% receiver" is industry vernacular that refers to an unfinished firearm that has not yet reached the point in the manufacturing process where it should be classified as a "firearm" as defined by 18 U.S.C. § 922(a)(3). The unfinished receivers are usually fabricated to a point where minimal work needs to be completed by the purchaser in order to convert it into a "firearm."  Since "80% receivers" do not meet definition of a firearm, they are not subject to the same requirements to purchase, transfer, or possess. "80% receivers" can be purchased by anyone, including prohibited persons, such as persons previously convicted of a crime punishable by more than one year in prison, and are often purchased through the Internet with no record keeping requirements.

9. There are several methods to "manufacture" the unfinished receiver into a firearm.  Some of these methods involve milling out or drilling the unfinished receiver. This can be accomplished by using different types of tools or machines such as a drill press, a milling machine, rotary tool such as a Dremel, or a computer numerical control ("CNC") milling machine amongst others. CNC milling is a machining process that uses computerized controls and rotary cutting tools to progressively remove material from the working item, resulting in custom-designed part or product.  The process of drilling out or milling out the unfinished receiver generally creates metal shavings on or around the used equipment. Often, the unfinished receiver will come with a template to guide where milling or drilling must occur in order to complete the firearm.  Once the receiver has been completed, it is usually affixed with other firearms parts and accessories that constitute a firearm under federal law. There are numerous parts and accessories that can be added to the receiver, such as barrels, stocks, and triggers.

These individual parts and accessories can also be purchased by any individual, including prohibited persons.

## PROBABLE CAUSE

9. On May 27, 2022, Columbus Police Department (CPD) Joint Narcotics Enforcement Team (JNET) conducted a controlled purchase for two firearms from Alexander CLARK, male, DOB: xx-xx-1995, SSN: xx-xx-6402, address of 1199 Hospital Road, Lot 257, Franklin, IN 46131 (PREMISES).

10. Your Affiant reviewed a report of the controlled buy which occurred on May 27, 2022. The report indicates that on or about May 20, 2022, a credible and reliable CI[1] contacted CPD JNET Detective Schultz. The CI advised Detective Schultz that the CI spoke with CLARK about CLARK having firearms for sale. The CI advised Detective Schultz that he/she informed CLARK that he/she was a convicted felon and could not buy firearms from a gun store. CLARK was still willing to sell the CI firearms.

11. On May 27, 2022, the CI contacted Detective Schultz and advised he/she could purchase a 9mm Glock pistol and an AR-15 lower receiver for $1,000 from CLARK. The summary of the controlled purchase from CLARK are as follows. CPD detectives utilized pre-recorded buy money in the amount of $1,000. CPD detectives also searched the CI's vehicle and the CI's person prior to the controlled buy and no contraband was located. The CI was provided an audio/video recording device, and kept under constant surveillance during the operation.

---

[1] The CI has been a documented paid informant for CPD since 2019. The CI has conducted several controlled buys of controlled substances, to include heroin and fentanyl, as well as controlled purchases of firearms. Each of the targets which were the subject of the CPD investigation and involved the CI were convicted of criminal offenses. The CI has not, to your Affiant's knowledge, provided false information to a law enforcement officer in his/her capacity as a CI. The CI has the following criminal history: a domestic battery conviction, unlawful possession of a syringe, possession of methamphetamine, and false informing/B misdemeanor. Each of the CI's interactions with CLARK were captured on an audio/video recording device.

12. At approximately 3:04 pm, the CI arrived at the PREMISES. The CI went inside the PREMISES with CLARK. At approximately 3:11 pm, the CI provided CLARK with the $1,000 in pre-recorded buy money. CLARK gave a privately made firearm (PMF) Glock style pistol with no serial number, and a 3-D printed PMF AR-15 style lower receiver (no serial number) to the CI. CLARK made references to this lower receiver being a fully automatic machinegun and by pulling the trigger one time it will fire all rounds.

13. During the controlled buy, the CI told CLARK he/she was a felon and also had a domestic battery (conviction). CLARK still sold the CI two firearms even after being told by the CI that he/she was a convicted felon and domestic batterer. Prior to leaving, CLARK told the CI he had a 3-D printer. CLARK also gave the CI a holster for the PMF pistol.

14. At approximately 3:18 pm, the CI left CLARK's residence and met with CPD Detectives Densford and Schultz. Detective Schultz took custody from the CI the purchased firearms from CLARK. CPD conducted a post search of the CI's vehicle and the CI's person, and no contraband was located. CPD de-briefed the CI and the CI advised what occurred during the controlled buy. CPD also provided the CI with a six-pack photo lineup and the CI identified photograph # 6 as the person that sold the CI the firearms. Photograph # 6 was that of CLARK.

15. CPD Detective Schultz photographed the purchased firearms, neither of which had a serial number. Detective Schultz advised your Affiant the AR-15 lower receiver was marked, "Anderson Firearms Model 5.56 Hellfire Made in Texas or Not at All," and the other side of the lower receiver was marked, "When Demons Come, Bring on the Hellfire." I later viewed this firearm, and determined this lower receiver was 3-D printed. The second firearm

was a black Glock style 9mm handgun marked, "PF940CL Polymer80, Inc. Made in USA, Dayton, NV." This pistol did not have a serial number and came with a 15-round magazine.

16. On June 2, 2022, the CI informed CPD that CLARK advised he could build another handgun (PMF), and that it would cost between $500 to $600. The CI told CPD that CLARK requested a $300 pre-payment so CLARK could purchase the materials to build the PMF.

17. On June 8, 2022, I requested an intelligence summary of CLARK to check for any firearms traces, multiple firearm purchase sales, a Federal Firearms License query, and if CLARK had any National Firearms Act (NFA) weapons registered to CLARK in the National Firearms Registration and Transfer Record (NFRTR). ATF Intelligence Research Specialist (IRS) Scott Pratt completed a records check for your Affiant. The information revealed CLARK did not have Federal Firearms License. Neither CLARK nor the PREMISES has any NFA firearms registered in the NFRTR.

18. On June 9, 2022, CPD advised your Affiant that the CI was able to meet with CLARK on June 9, 2022, to make the $300 down payment to CLARK to build a 3-D printed PMF. Prior to the controlled payment, CPD obtained $450 in pre-recorded buy money, and later went to the area of CLARK's residence for surveillance. CPD Detectives Densford and Schultz met the CI at a predetermined location. CPD searched the CI and CI Vehicle, finding no contraband or currency. At approximately 2:55 pm, CPD provided the CI with the pre-recorded buy money and an audio/video recording device, and kept under constant surveillance.

19. At approximately 2:57 pm, the CI called CLARK to arrange a meeting to make the PMF down payment. At approximately 3:01 pm, the CI arrived at the PREMISES and made

contact with CLARK.  At approximately 3:38 pm, CLARK accepted $300 in pre-recorded buy money from the CI.

20. At approximately 3:43 pm, the CI left the PREMISES.  Following the payment to CLARK, the CI met with detectives, and surrendered the audio/video recording device and the $150 in unused pre-recorded buy money.  Both the CI and the CI vehicle were searched, and no contraband or currency were located.  The CI was debriefed as to the above events.  Additionally, the CI also indicated that he/she observed several handguns sitting on top of a dresser in the back room where CLARK took the CI.  CLARK told the CI that CLARK has a switch (machinegun) that CLARK is having difficulty in getting to work properly.  CLARK also showed the CI an example of a switch CLARK had produced.

21. On June 27, 2022, the CI notified CPD detectives that CLARK informed the CI that the handgun (privately made firearm) would be ready.  CPD sent surveillance units to the area of CLARK's residence.  At approximately 1:44 pm, CPD detectives met with the CI, where the CI and CI vehicle were searched, and no contraband or currency were found.  CPD provided the CI with an audio/video recording device.

22. At approximately 1:55 pm, the CI drove towards CLARK's residence and waited until CLARK told the CI that it was okay for the CI to arrive.  At approximately 2:08 pm, CI called CLARK prior to arriving at CLARKs residence.  CLARK advised he needed to work on the gun more because the part CLARK received in the mail was not the right part.  CLARK requested further payment.   The CI returned to CPD where detectives provided an additional $300 in pre-recorded buy money.  After all control measures were used, the CI returned to the PREMISES and provided this money to CLARK.  The CI confirmed with CLARK that the CI

would return the next day with the CI's cousin (ATF Undercover Agent ("UC")/your Affiant) to pick up the firearm.

23. On June 28, 2022, your Affiant (working in a UC capacity) and the CI met with CLARK at CLARK's residence, the PREMISES. During that interaction, your Affiant obtained a 3-D printed privately made firearm (PMF) from CLARK that resembled a Glock 19, 9mm pistol. This PMF was 3-D printed and had no markings or serial numbers. During this controlled buy/meet with CLARK, I ordered two additional 3-D printed PMF's from CLARK by providing CLARK with $700.00 in pre-recorded buy money, and the CI ordered one additional 3-D printed PMF from CLARK by providing CLARK with $400.00 in pre-recorded CPD buy money. During this controlled purchase, CLARK also discussed and attempted to sell what he styled as a fully automatic MAC-10 (though this could not be conclusively established). This transaction was captured by audio/video recording devices.

24. Following this controlled buy, I picked up the two PMFs from CPD that were purchased by the CI from CLARK on May 27, 2022 (these PMFs were the Glock style pistol (Polymer 80), and the unserialized 3-D Printed AR 15 lower receiver). ATF SA Steve Tastle and your Affiant function tested the 3-D printed PMF AR 15 style lower receiver. This function tested as a fully automatic machinegun.

25. Your Affiant sent the 3-D printed AR 15 style lower receiver to ATF's Firearms Technology Criminal Branch (FTCB) for a certified determination as a machine gun. On July 29, 2022, I was notified by an ATF Firearms Enforcement Officer (FEO) of the FTCB that the 3-D printed AR 15 style lower receiver was a machinegun and shot automatically more than one

shot, without manual loading, by a single function of the trigger. This machinegun was not registered in the NFRTR.

26. On August 18, 2022, while acting in an undercover capacity, your Affiant purchased two 3-D printed handgun PMF's and two drop in auto sears (machine gun conversion devices), and the CPD CI purchased one 3-D printed PMF firearm from CLARK in front of the PREMISES.  Prior to the controlled purchase, I obtained $2,000 of pre-recorded Agent Cashier funds.  Both the CI and your Affiant utilized functioning audio/video recording equipment.  The CI placed a recorded call (documented by Detective Schultz) to CLARK.  The CI told CLARK we would be there shortly.  At approximately 2:30 pm, I drove the CI in an ATF UC vehicle to CLARK's residence (PREMISES) and parked in front.

27. At approximately 2:36 pm, I observed CLARK exit the front door of the PREMISES.  CLARK was walking with crutches.  CLARK was wearing the same t-shirt as CLARK wore in a previous controlled buy and also had a bag across his shoulder.  CLARK sat in the front passenger seat of the UC vehicle next to your Affiant.  CLARK placed the bag on his lap.  CLARK discussed in detail related to the delay in shipping of necessary materials, as well as some detail about the 3-D printing process.  CLARK then showed your Affiant the three previously ordered Glock style, 3-D Printed PMFs.

28. Your Affiant and CLARK also discussed the purchase of drop in auto sears and switches.  After discussion, CLARK exited the UC Vehicle and returned to the PREMISES. CLARK returned to the UC car from inside the PREMISES a short time later and sat back in the front passenger seat.  CLARK removed two drop in auto sears (machineguns) and one selector switch from his left front pants pocket.  CLARK handed your Affiant the drop in auto sears and selector switch.   At approximately 3:00 pm, the CI paid CLARK with $200 in pre-recorded

CPD buy money to complete the purchase price of $600 for one 3-D printed PMF that resembled a Glock 19 pistol.  I counted out $550 in pre-recorded ATF buy money to complete the purchase price of $1200 for the purchase of two (2) 3-D printed PMFs that resembled a Glock 19 pistol, and $50 for the purchase of two drop in auto sears (machine guns) and one selector switch.  I handed CLARK the pre-recorded buy money.  After CLARK received the money, I asked CLARK if he wanted to print more drop in auto sears next week.  CLARK said he could print a whole plate full of them.

29.   After the control buy, all items of evidence described above were collected.  None of the 3-D printed PMF's have any manufacturer markings or a serial number.  Your Affiant sent a photo of the two purchased drop in auto sears and one selector switch to a Firearms Enforcement Officer (FEO) of the Firearms Technology Criminal Branch (FTCB) for verbal device determination.  I was told based on the photos the items appear to be machinegun conversion devices (machineguns) and a selector switch.  Again, CLARK has nothing registered

in the NFRTR.  I placed the purchased evidence into the ATF evidence vault.  Below are photos of the purchased PMF's and machine gun conversion devices.



## CONCLUSION

30. Based on the foregoing, there is probable cause to believe that CLARK has violated the TARGET OFFENSES.  I submit this affidavit in support of a Criminal Complaint charging CLARK these violations and request a warrant for his arrest.

Respectfully Submitted,

/s/Caleb Anderson
Caleb Anderson, Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives/BDG

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1, by telephone.

Date: 8/22/2022

Tim A. Baker
United States Magistrate Judge
Southern District of Indiana